# IN THE COURT OF APPEALS OF IOWA

No. 24-0218
Filed June 5, 2024

**IN THE INTEREST OF W.T., L.T., and L.T.,**
**Minor Children,**

**L.T., Minor Child,**
        Appellant,

**H.T., Mother,**
        Appellant.

_____

        Appeal from the Iowa District Court for Washington County, Daniel Kitchen,

Judge.


        A mother and one child separately appeal the termination of the mother's

parental rights.  **AFFIRMED ON BOTH APPEALS.**


        Katie Mitchell of Mitchell Law Office, PLC, Washington, for appellant minor

child L.T.

        Jeannette Keller of Bowman, DePree and Murphy, West Liberty, for

appellant mother.

        Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney

General, for appellee State.

        Sara Strain Linder of Linn County Advocate, Inc., Cedar Rapids, guardian

ad litem for minor children and attorney for W.T. and L.T.

Considered by Bower, C.J., Greer, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**GAMBLE, Senior Judge.**

A mother and one child appeal the termination of the mother's parental rights to three of her children. After careful consideration, we conclude the child's opposition to termination does not overcome the danger posed by the mother, and termination of the mother's rights was in the best interests of the children.

**I. Background Facts & Proceedings**

The mother (H.T.) and R.T. are the parents of three children: W.T., born in 2006, L.T., born in 2006, and L.T., born in 2007. The elder L.T. prefers to go by N.T., and the youngest child prefers O.T. We will use the children's preferred initials and pronouns. The mother and children moved to Iowa around 2012; the father remained in Kentucky. At the time of the termination hearing, the mother had moved to Vermont, but her parents still live in Iowa and she receives mail here.

The Iowa Department of Health and Human Services (HHS) became involved with the family in August 2021 due to the state of the home, unsecured prescription medications, and giving the children unprescribed medications. The children had been moved among several schools in the area; the mother took the children out frequently for medical appointments and would not provide releases so the school could coordinate with medical providers for the children's education plans. O.T. was only attending school around forty-five minutes a day at the time of removal. Due to the large number of medical diagnoses and medications each child was taking, HHS arranged for a medical record review. A medical team reviewed the records and determined the children were victims of medical child abuse perpetrated by the mother in the form of factitious disorder imposed by another person; the lead doctor opined it was not safe to leave the children in the

home at the time. The children were then removed from the mother's care. In the order adjudicating them children in need of assistance (CINA), the court found all three children "have experienced mental injury as victims of medical child abuse, and do not function within their expected range for performance and behavior as a result."

All three children have been given incorrect diagnoses over the years based on the mother's false reporting; the afflictions attributed to one or more child at various times include cerebral palsy, autism, developmental delays, intellectual disability, seizure disorders, incontinence, recurring respiratory infections, gastrointestinal problems, diabetes, premature birth, choking spells, apnea, deafness, and walking and leg problems. The records review compared the clinical findings in the voluminous medical records with the afflictions reported by the mother; most had little to no evidence of actually affecting the children. The false reporting dated back to the birth of the oldest child and continued throughout the children's lives. The children also reported having a variety psychological disorders.

In July 2022, W.T. and N.T. moved to the father's home in Kentucky, were formally placed there the next month, and custody transferred that fall. They have thrived in his care. They attend school regularly and have part-time jobs—they are "just normal teenagers." They have improved significantly academically, and W.T. grew several inches and no longer uses a wheelchair or leg braces. The children were weaned off their prescriptions, and now only take one or two medications for common issues.

O.T. resisted contact with the father and did not transfer to his care with the older siblings. Instead, O.T. has moved among foster families, shelter care, and a qualified residential treatment provider. O.T. did not receive regular mental-health therapy throughout the case for a variety of reasons—including the mother's resistance to switching the child's therapists, moves, and insurance issues—which made it harder for O.T. to process what was going on. O.T. has recently been reducing and weaning off some of his medications based on reduced or eliminated mental-health, neurological, diabetes, and seizure diagnoses. In June 2023, the mother met with O.T.'s school (without including O.T., HHS, foster parents, the guardian ad litem (GAL), or the child's attorney in the meeting) and tried to update O.T.'s educational plan to place the child at a residential school, which would have removed the child from his foster placement. Although HHS attempted to limit the mother's contact with O.T. after the permanency order changing the goal to termination, a worker acknowledged O.T. had a phone and it appeared they were having unsupervised phone calls. After O.T. ran from a placement and sheltered with the mother and grandmother, without any of them informing HHS or law enforcement of his location, HHS cut off contact between the mother and O.T. The mother did continue to attend O.T.'s medical appointments, finding out about them from the online portal; HHS did not tell her she could not attend.

In October 2022, the mother underwent a psychological evaluation. The psychologist affirmatively diagnosed the mother with factitious disorder imposed on another. The mother denied her actions caused any harm to the children and denied any need for change or treatment. The psychologist concluded "until [the mother] makes significant therapeutic change, her children remain at-risk for

continued emotional and physical harm." The psychologist also noted the mother's long-term vilification of the father to the children would be damaging to the children and would be the source of O.T.'s feelings towards the father, given the child's young age at the time they split. "[I]ntensive and extensive" therapy was recommended for the mother. This last point is also supported by observations from service providers; for example, the mother "has made it very clear that [the father] is dangerous and [O.T.] should not want to speak to him." The mother went to some therapy in the first half of 2023 but could not remember if she provided her therapist with a copy of the evaluation, and had not had any appointments for several months at the time of the termination hearing.

The mother exhibited a preference in favor of O.T. over the other children during visitations, particularly by criticizing and ignoring the older children. The mother's behavior documented in the monthly progress reports showed significant levels of manipulation, encouraging the children to speak and act like young children, but also placing O.T. in an inappropriate decision-making role. The mother appeared to sabotage any other familial relationships which might support the children—with not only their own father but also the mother's siblings and other family members.

An HHS worker explained the petitions to terminate the mother's rights were filed to protect the children's medical care and education and "because there had been no progress forward to be able to reunite them, really, with their mother."

The juvenile court terminated the mother's rights as to all three children under Iowa Code section 232.116(1)(f) (2023), finding clear and convincing evidence the children could not be returned to the mother's custody. After

observing the mother throughout the case, including her testimony at the termination hearing, the court found "it was clear . . . that [the mother] was utterly convinced that all her actions were correct, and she remains devoid of any insight into the harm she has continued to cause her children, especially [O.T.]." More, even after some counseling, "credible evidence indicates that [the mother] continued to be an active danger to the children" and she had "no intention of seeking help." The court then noted O.T.'s "aggressive loyalty" to the mother and her narrative, and the effect on O.T.'s relationships with her siblings and the father. While finding the mother loves the children, the court held "[c]lear and convincing evidence shows that [the mother] is tragically not able to provide the children with the care *they* need." The court opined O.T.'s objection to the termination "is a symptom of the trauma that [O.T.] has experienced" and likened the mother-child bond "like the bond between a boa constrictor and its prey."

The mother and O.T. appeal.

## II. Analysis

We review the record in termination cases de novo and accord weight to the juvenile court's findings of fact. *In re J.H.*, 952 N.W.2d 157, 166 (Iowa 2020). Our review normally follows a three-step analysis found in Iowa Code section 232.116—evaluating the grounds for termination, determining the best interests of the children, and weighing possible exceptions to termination. *In re A.R.*, 932 N.W.2d 588, 591 (Iowa Ct. App. 2019). Because the mother does not challenge the grounds for termination, we will not address that step.

*1. W.T. and N.T.* The mother argues that termination of her rights to her older two children "was unnecessary and is not required to achieve the best

interests of these children." She urges that since the father has sole legal custody and care of both children, and the court has restricted her contact with the children, the court should just let the children determine what contact they want with her instead of terminating her rights. We interpret this as a best-interests challenge under step two and a possible application of the first listed permissive exception under Iowa Code section 232.116(3)(a)—"a relative has legal custody of the child."

Both N.T. and W.T. told their father and the GAL they wanted the mother's parental rights to them terminated. The father wanted the mother's rights to W.T. and N.T. terminated to "prevent her from contacting schools, doctors, work places, and creating further issues for them." The GAL expressed concern the mother would interfere with the children without monitoring from HHS. And the mother agreed she still had access to W.T. and N.T.'s medical records "because I still have parental rights." She stated she objected to the termination as to W.T. and N.T. because "I don't want them to think I gave up on them or I abandoned them" and she wanted to make sure O.T. could maintain a sibling relationship with them.

Both N.T. and W.T. have resisted any contact with the mother for more than a year before the termination hearing. The mother acknowledges W.T. has turned eighteen since the termination order, and she no longer has any authority over any facet of his life.[1] And she recognizes that N.T. is nearly eighteen and will soon exercise a similar control over their life.

---

[1] Although now an adult, W.T. was not yet eighteen when the court's ruling was made. Because the juvenile court had jurisdiction at the time of its ruling, we retain jurisdiction of this appeal. *See In re M.A.*, No. 24-0092, 2024 WL 1548812, at *2 n.6 (Iowa Ct. App. Apr. 10, 2024) (considering mootness of a CINA appeal when the child had turned eighteen after the appealed order was filed).

Given the mother's long history of inflicting unnecessary medical care for manipulated diagnoses as well as the mental and emotional harm she has caused, we find termination is the best option to ensure W.T. and N.T.'s safety, long-term nurturing and growth, and the children's physical, mental, and emotional condition and needs. *See* Iowa Code § 232.116(2). Nor does the fact that the father has legal custody provide reason in this case to not terminate the mother's rights. We affirm the termination of the mother's parental rights as to W.T. and N.T.

*2. O.T.* The mother does not contest the grounds for termination. *See* Iowa Code § 232.116(1)(f). Rather, she argues termination of her parental rights to O.T. is not in the child's best interests, the child does not want her rights terminated, that the child would be harmed by termination because she is "the only constant in [O.T.]'s life" since the removal.

O.T. also contests the termination of the mother's parental rights, noting termination would make no difference as to the child's permanency or long-term placement. O.T. asserts he is closely bonded to the mother and his only meaningful family relationships are with her and the maternal grandmother. A long-term placement has not been found for O.T., and he has moved in and out of foster homes and shelter placements. He told the court "being away from home has not helped anything." The moves have further disrupted O.T.'s schooling and made arranging therapy difficult.

The father admitted he was not a good alternative for O.T.'s placement at the time of the hearing. He stated O.T. did not want to live with him, he was not comfortable with the idea given some of O.T.'s past behaviors, and the influence the mother still had on O.T would be detrimental to W.T. and N.T. O.T. agreed he

did not want to go to the father's home because the father is not accepting of O.T.'s gender identity.

In a 2022 permanency order, the juvenile court found the mother "has not recognized the harm she has done to her children, is not interested in change of any kind, and remains resistant to any effort to prevent her condition from harming her children." The court moved custody of O.T. to the father, but it was then returned to HHS after O.T. ran away and the father refused to take custody. In early 2023, the court waived the requirement to make reasonable efforts to reunite O.T. with the mother.

Even at the termination trial, the mother did not seem able to accept that the children did not have many of the diagnoses she arranged over the years, including cerebral palsy, autism, or seizure disorders. The mother's inability to distinguish between the child's actual medical needs and her perception of what the child needs have resulted in unnecessary medical appointments, physical and mental diagnoses, and medications, and served to make the children as dependent on her as possible. She does not accept her own diagnosis of factitious disorder imposed by another person or that she harmed the children through years of unnecessary and harmful medical care, and she has not pursued any related mental-health treatment for herself. In short, the mother has not demonstrated an ability to recognize the child's true needs or put the child's well-being above her own needs. *See In re D.D.*, 955 N.W.2d 186, 193 (Iowa 2021) ("It's folly to think the mother will stand sentinel to protect against a foe she doesn't acknowledge exists."); *see also In re E.R.*, No. 20-1076, 2020 WL 7021681, at *3 (Iowa Ct. App. Nov. 30, 2020) (finding termination in the children's best interests despite

placement instability due to the mother's inability to prioritize their needs and well-being). Terminating the mother's rights would prevent her from access to, manipulation of, and authority over O.T.'s medical decisions and schooling, which would be best for the child's current and long-term safety, growth, and well-being. Termination is in the child's best interests.

But the court need not terminate the relationship between parent and child where, as here, the child is over ten years of age and objects to the termination. *See* Iowa Code § 232.116(3)(b). O.T.'s objection is an important consideration as a possible reason not to terminate the mother's parental rights. *See A.R.*, 932 N.W.2d at 592. And the child's objection is intertwined with the parent-child bond. *See* Iowa Code § 232.116(3)(c). O.T. claims termination of his mother's parental rights would leave him in limbo. The father is not a proper placement. O.T. does not want to go to another foster family and will not be adopted. He cannot stay in residential treatment indefinitely. H.T. is the only parent who remains in contact with O.T. and the child wants to remain in contact with her.

But we recognize "[t]he best interests of a child is not always what 'the child wants.'" *A.R.*, 932 N.W.2d at 592 (citation omitted) (noting several factors to consider[2]). Here, the mother's behavior throughout the case convinces us she cannot safely have the right to be part of any decisions in O.T.'s life. Her negative

---

[2] Factors considered include, but are not limited to:
> (1) [the child's] age and education level; (2) the strength of their preference; (3) their intellectual and emotional make-up; (4) their relationship with family members; (5) the reason for their decision; (6) the advisability of honoring the children's desire; and (7) the court's recognition it is not aware of all the factors influencing the children's view.

*A.R.*, 932 N.W.2d at 592.

behavior includes interjecting herself into, disbelieving, and objecting to medical decisions; attempting to change O.T.'s school without consulting O.T. or HHS; influencing O.T.'s reactions to foster families and support structures; helping O.T. run from placement; manipulating O.T.'s relationship with his siblings; and making accusations against family members that might otherwise provide a support system for O.T. While we understand O.T.'s desire to maintain contact with his mother, she had not demonstrated an ability to safely care for his needs. *See In re B.W.*, No. 23-0583, 2023 WL 3861979, at *4 (Iowa Ct. App. June 7, 2023) (affirming termination where a close parent-child bond existed but the juvenile court ongoing contact between parent and child would be detrimental to the child's physical and emotional well-being). Because our paramount concern must be the long-term best interests of the child, *see* Iowa Code § 232.116(2), we affirm the termination of the mother's parental rights.

**AFFIRMED ON BOTH APPEALS.**

Bower, C.J., concurs; Greer, J., concurs specially.

**GREER, Judge** (concurring specially).

I concur with the well-written opinion in this case but write separately to emphasize the cracks in the safety system afforded to children like O.T., who find themselves in the child-in-need-of-assistance world. Here, the guardian ad litem opined that O.T. is at risk of being "institutionalized" and had not received any meaningful mental-health treatment over the course of these proceedings. While much of the discussion in our decision focuses on the mental health of the mother, the stated goal of reunification of families is not realistic if the mental health of a child diagnosed with serious mental-health conditions is not addressed. And the treatment is not just for reunification purposes but also for dealing with the impact of the breakup of the family. *See In re K.N.*, 625 N.W.2d 731, 734 (Iowa 2001) ("The purpose of the juvenile process in general has always been to care for, educate, and train the children adjudged in need of assistance . . . ."); Iowa Code § 232.1 (2023) ("This chapter shall be liberally construed to the end that each child under the jurisdiction of the court shall receive . . . the care, guidance and control that will best serve the child's welfare and the best interest of the state."). I can only wonder if O.T. would have been in a better position to face the traumatic steps toward termination of the mother's parental rights if mental-health therapy had been ongoing rather than what actually happened here—where the child received "no treatment services for the past two years."

We can do better, and we should do better. *See K.N.*, 625 N.W.2d at 734–35 (recognizing "the underlying policy of chapter 232 to be '[t]he welfare and best interests of the children'" (citation omitted)).